IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| MAYRA FRANCO, individually and on behalf of a class of similarly situated persons, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:24-CV-225 |
| PROGRESSIVE CASUALTY INSURANCE COMPANY AND PROGRESSIVE SOUTHEASTERN INSURANCE COMPANY, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, Chief District Judge.

The plaintiff, Mayra Franco, submitted a claim to her insurer, defendant
Progressive Southeastern Insurance Company, after her 2004 Jeep Grand Cherokee was
totaled.  She alleges that Progressive Southeastern underpaid her claim and that defendant
Progressive Casualty Insurance Company, which manages and controls the insurance
claims process for Progressive affiliates, systematically underpays insureds who submit a
total-loss claim by the arbitrary and illegal use of a "projected sold adjustment" (PSA).
Based on this conduct, she asserts a claim under the North Carolina Unfair and Deceptive
Trade Practices Act, and she seeks to certify a class of all Progressive insureds whose
total-loss claims were adjusted with the inclusion of a PSA.  She has satisfied the Rule 23
requirements, and her motion for class certification will be granted.

## I.  Facts and Background

Progressive Southeastern is an insurance company that underwrites automobile liability and collision insurance in North Carolina.  *See* Doc. 53 at 17–20;[1] Doc. 45-9. Progressive Casualty adjusts all vehicle total-loss claims in North Carolina for its underwriting affiliates, *see* Doc. 53 at 14–16, 19–20; Doc. 47-1 at 11; Doc. 45-13 at ¶ 9, including Progressive Southeastern.  *See* Doc. 53 at 19–20; Doc. 59-1 at ¶ 1.  For ease of reading, the Court will hereafter refer to the defendants collectively as "Progressive."

In 2023, Ms. Franco was in a car accident that resulted in the total loss of her 2004 Jeep Grand Cherokee.  Doc. 62-1 at 8, 11; *see* Doc. 45-7.  At the time, she had an insurance policy with Progressive, and she submitted a claim.  *Id.* at 11.

Progressive's policy provides that it "will pay for direct and accidental loss to your covered auto."  Doc. 45-5 at 24.  It limits its liability to the lesser of the actual cash value or the amount necessary to repair or replace the property.  *Id.* at 28; Doc. 53 at 30–32. The policy does not include a method for determining actual cash value.  It provides that the payment will be reduced by a deductible, Doc. 45-5 at 24, and that "[a]n adjustment for depreciation and physical condition will be made in determining actual cash value at the time of loss."  *Id.* at 28.

North Carolina regulations also impose duties on insurers when calculating actual cash value of totaled vehicles.  These will be discussed in detail *infra*.

---

[1] The Court uses the pagination appended by the CM/ECF system for this and other deposition cites, not the internal pagination used by court reporters transcribing the deposition.

To determine the amount it will offer to pay to satisfy the claim, Progressive uses software it licenses from Mitchell International, Inc. called WorkCenter Total-Loss (WCTL) to generate valuation reports. Doc. 59-1 at ¶¶ 3, 5. Mitchell maintains a database of vehicles recently sold or currently listed for sale and uses these comparator vehicles to estimate the actual cash value of the claimant's vehicle. *Id.* at ¶ 5; Doc. 59-2 at ¶ 18. If a comparable vehicle is listed for sale at a dealer that is not known to be a "no-haggle" dealer, Mitchell reduces the vehicle's list price with a "projected sold adjustment" (PSA) to account for the possibility that the vehicle will sell for less than the list price.[2] Doc. 59-1 at ¶ 6; Doc. 45-7 at 10.

All Progressive affiliates use the WCTL Reports as part of the claims adjustment process. *See* Doc. 53 at 24, 27–29; Doc. 52 at 24–25, 27–29. Progressive also uses other methods to determine actual cash value, but those methods are not at issue here. *See* Doc. 59-1 at ¶ 16.

To estimate the actual cash value of Ms. Franco's Jeep, Progressive generated a WCTL Report using the Mitchell software. Doc. 45-7. The report identified four comparable vehicles currently on the market and included their asking price. *Id.* at 4, 6–9; Doc. 53 at 49. Because those comparable vehicles were listed for sale but had not yet been sold, the Mitchell software automatically reduced the value of each of those comparator vehicles using the PSA. Doc. 45-7 at 6–9. Averaging those reduced values

---

[2] For the sake of brevity and ease of reading, the Court has oversimplified some facts that are not particularly relevant to class certification, including those about how the PSA is calculated and other matters. *See* Doc. 68-2 at ¶ 7 (noting that J.D. Power played a role in designing the WCTL software and PSA); 68-4 at ¶ 27 (same).

and applying adjustments and deductions not at issue here yielded the amount of $3,205.65. *See id.* at 2, 4; Doc. 45-8. Less the deductible, fees, and taxes not at issue here, that is what Progressive offered and paid Ms. Franco. Docs. 45-8, 45-9; Doc. 59-2 at ¶ 32. Without the PSA deduction, the calculation would have been higher, and Ms. Franco contends she would have and should have received $357.50 more from Progressive for her Jeep. Doc. 47 at 11, 20 n.10.

## II. Ms. Franco's Claims and Procedural History

Ms. Franco filed this action in March 2024. *See* Doc. 1. In the operative complaint, she asserts an individual claim against Progressive Southeastern for breach of contract, Doc. 20 at ¶¶ 72–82, and a claim under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 *et seq.* (Chapter 75), against Progressive Casualty on behalf of a putative class. Doc. 20 at ¶¶ 83–103.[3] Both claims are based solely on the defendants' systemic use of the PSA when calculating the actual cash value of a totaled vehicle; Ms. Franco says that by applying the PSA, Progressive causes claimants to receive less than the actual cash value of their vehicles. *Id.* at ¶¶ 31–32, 57, 71, 81, 85–86, 88, 96–98; Doc. 45 at 8–12. She does not seek class certification for her breach of contract claim, and that claim will not be discussed further in this order.

Ms. Franco asserts that Progressive's use of the PSA violates North Carolina's total-loss regulation and is thus a *per se* unfair trade practice under Chapter 75. Doc. 20

---

[3] Early in the litigation, the Court dismissed Ms. Franco's Chapter 75 claim to the extent it was based on deceptive acts or violations of the North Carolina Unfair Claim Settlement Practices Act, N.C. Gen. Stat. § 58-63-15(11). Doc. 25 at 7.

at ¶¶ 84–86; Doc. 45 at 8.  In the alternative, she contends that the application of the PSA is an unfair practice because it violates public policy and industry standards.  Doc. 20 at ¶¶ 96–97; Doc. 45 at 8.

Ms. Franco now moves to certify a class of similarly situated individuals pursuant to Rule 23 of the Federal Rules of Civil Procedure.  Doc. 44.  She proposes the following class definition:

> All Progressive insureds of any North Carolina Progressive Company underwriting policies in North Carolina with first-party auto policies issued in the State of North Carolina, who received compensation for the total loss of their vehicles under their first party (comprehensive, collision, and UM/UIM) coverages, and who received a total loss valuation from Progressive generated by the WCTL program which took a deduction/adjustment for "projected sold adjustment" and were paid the amount of the valuation with the "projected sold adjustment."

*Id.* at 1; Doc. 45 at 6.

Both parties filed briefs with evidentiary support.  Docs. 45, 47, 59, 61, 62, 64. Upon the Court's order, Doc. 65, Ms. Franco also filed a proposed jury verdict form to clarify her proposed common questions of fact.  Docs. 72, 72-1.

Ms. Franco, Progressive, and Mitchell International, Inc., filed several motions to seal.  Docs. 46, 60, 63, 68, 73.  Those motions will be addressed in a separate order.

### III.   Chapter 75 Claims and the Total-Loss Regulation

In relevant part, Chapter 75 states that "[u]nfair methods of competition in or affecting commerce, and unfair . . . practices in or affecting commerce, are declared unlawful."  N.C. Gen. Stat. § 75-1.1(a).  Some violations of statutes and regulations are *per se* unfair trade practices.  *See, e.g.*, *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C.

5

App. 649, 659, 670 S.E.2d 321, 329 (2009) ("A violation of the Trade Secrets Protection Act constitutes an unfair act or practice under [Chapter 75].").  But an unfair trade practice can also arise out of specific acts or a course of conduct.  *See, e.g.*, *Odell v. Legal Bucks, LLC*, 192 N.C. App. 298, 318, 665 S.E.2d 767, 780 (2008) (holding that a violation of N.C. Gen. Stat. § 24-1.1 is not a *per se* violation, but it may be considered in combination with other evidence that the defendants committed unfair and deceptive acts).  A practice is unfair if it "offends established public policy [or] . . . is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 72, 653 S.E.2d 393, 399 (2007) (quoting *Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981)).  For a Chapter 75 claim, the jury determines the facts.  *Id.* at 71.  Then, the court determines as a matter of law whether those facts are an unfair practice in or affecting commerce.  *Id.*

When a North Carolina insured has an accident that results in damage to a covered vehicle of at least 75% of the pre-accident cash value, North Carolina regulations require the insurer to "designate the motor vehicle as a 'total loss' and pay the claimant the pre-accident value."  11 N.C. Admin. Code 4.0418(c) (2020).  The regulations also provide that a settlement offer must be based on the actual cash value of the vehicle, which is determined by:  "(1) [t]he published regional average values of substantially similar motor vehicles; and (2) [t]he retail cost of two or more substantially similar motor vehicles in the local market area when substantially similar motor vehicles are available or were available within 90 days of the accident to consumers in the local market area." *Id.* at 4.0418(d); *see also* Doc. 25 at 5–6.  In making a settlement offer, an insurer can

6

make adjustments "for condition, options, equipment, and mileage, less the cost of unrepaired damage that pre-existed the accident," 11 N.C. Admin. Code 4.0418(e), but the regulation does not authorize other adjustments or mention reducing the value of comparable vehicles that are available for sale as opposed to recently sold. If an insurer attempts to settle on a basis that deviates from the regulation, "the deviation must be supported by documentation within the claim file detailing the total loss motor vehicle's condition and the reason for the deviation[,] . . . [and] [t]he documentation . . . shall be shared with the claimant." *Id.* at 4.0418(h).

In other words, the regulations prohibit an insurer from offering its insured less than the pre-accident actual cash value. And if the insurer determines the actual cash value in a way that deviates from the methods authorized by the regulation, it must support that deviation with documentation.

## IV. Class Certification

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (cleaned up). To qualify for the exception, the plaintiffs "must affirmatively demonstrate their compliance" with Federal Rule of Civil Procedure 23. *1988 Tr. for Allen Child. Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513, 521 (4th Cir. 2022) (cleaned up). District courts must rigorously assess the proffered evidence, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011), but they have "wide discretion" in evaluating whether the Rule 23 requirements have been met. *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2010); *see also Reiter v. Sonotone Corp.*, 442 U.S.

7

330, 345 (1979) (noting that district courts "have broad power and discretion vested in them" as to the "certification and management of potentially cumbersome" class actions).

Where necessary, the Court must "resolve a genuine legal or factual dispute relevant to determining the requirements" of Rule 23. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008). This may require courts to "probe behind the pleadings" and consider inquiries that overlap with the merits of the underlying claim. *Comcast*, 569 U.S. at 33–34; *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (noting that "a court should consider merits questions to the extent that they are relevant to" class certification (cleaned up)). "The likelihood of the plaintiffs' success on the merits, however, is not relevant to the issue of whether certification is proper." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006).

There are a number of requirements a plaintiff must meet in order to obtain class certification. Rule 23 has threshold requirements that the plaintiff be a member of the class and that the class members be ascertainable. The plaintiff must also meet the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. Finally, the plaintiff must meet one set of requirements under Rule 23(b). Here, Ms. Franco proceeds under Rule 23(b)(3), so she must also show predominance and superiority.

## A. Threshold Requirements

As a threshold matter, Rule 23 requires the proposed class members to be readily identifiable or ascertainable and the proposed class representative to be a member of the proposed class. *See Peters v. Aetna Inc.*, 2 F.4th 199, 241–42 (4th Cir. 2021) (recognizing

an "implicit threshold requirement" that class members be "readily identifiable");

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997) ("A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." (cleaned up)); *see also* Fed. R. Civ. P. 23(a). To be readily identifiable, plaintiffs do not need to be able to "identify every class member at the time of certification." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019) (quoting *EQT Prod.*, 764 F.3d at 358). Rather, a class need only be defined "in such a way as to ensure that there will be some administratively feasible way for the court to determine whether a particular individual is a member at some point." *Id.* (cleaned up).

Here, the putative class members are ascertainable. Class members can be identified through objective criteria, largely using Progressive's records. *See* Doc. 47-14 at 4–5; Doc. 49 at 4–5; Doc. 47-11. The defendants make no argument to the contrary. Ms. Franco is a member of the putative class. She is a Progressive customer who filed a total-loss claim and was paid based on a WCTL report that included PSAs. Docs. 45-7 to 45-9; Doc. 62-1 at 11. Both threshold requirements are satisfied.

## B. Rule 23(a) Requirements

Plaintiffs seeking class certification must meet the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *Peters*, 2 F.4th at 241; Fed. R. Civ. P. 23(a). "These four requirements effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Krakauer*, 925 F.3d at 654 (cleaned up). They are all met here.

## 1. Numerosity

Rule 23(a) requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). While "no specified number is needed to maintain a class action, . . . a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone." *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021) (cleaned up).

Progressive does not dispute that Ms. Franco has satisfied the numerosity requirement. There are about 60,000 potential class members, Doc. 49 at 5–6; Doc. 47-14 at 5–6, and joinder of that many parties would be impracticable.

## 2. Commonality

To satisfy the commonality requirement, there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To establish commonality, "the plaintiff [must] demonstrate that the class members have suffered the same injury." *Wal-Mart*, 564 U.S. at 349–50 (cleaned up). "Even a single common question will do," *id.* at 359 (cleaned up), "but it must be of such a nature that its determination will resolve an issue that is central to the validity of each one of the claims in one stroke." *EQT Prod.*, 764 F.3d at 360 (cleaned up); *see also Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 780 (4th Cir. 2023) ("Commonality requires [that] an entire set of claims depend upon a common contention that is capable of classwide resolution." (cleaned up)).

Ms. Franco has identified a number of common questions. *See* Doc. 72-1. Among others, key common questions likely to arise at summary judgment and trial are whether the application of a PSA is a *per se* unfair act under Chapter 75 and whether Progressive's

10

actions were in or affecting commerce.[4]  Ms. Franco has satisfied the commonality requirement.

### 3.  Typicality

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "The typicality requirement is met where the claims asserted by the named plaintiffs arise from the same course of conduct and are based on the same legal theories as the claims of the unnamed class members."  *Tatum v. R.J. Reynolds Tobacco Co.*, 254 F.R.D. 59, 65 (M.D.N.C. 2008) (cleaned up).  This requirement "goes to the heart of a representative parties' ability to represent a class," and the named plaintiff's interest in prosecuting its case "must simultaneously tend to advance the interests of the absent class members."  *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006).  The claims of the class representative and the claims of the class need not "be perfectly identical or perfectly aligned."  *Id.* at 467.

Ms. Franco's claim is typical of the proposed class.  Doc. 45-15 at ¶ 12.  As it did with the other putative class members, Progressive provided Ms. Franco with a valuation for her totaled vehicle that was reduced by the application of PSA deductions, and it paid her based on that valuation.  *See* Docs. 45-7 to 45-9.  Progressive does not dispute that

---

[4] "In a class action brought under Rule 23(b)(3), the commonality requirement of Rule 23(a)(2) is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over other questions."  *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 n.4 (4th Cir. 2001) (cleaned up); *accord Thorn*, 445 F.3d at 319.  The common questions will be discussed in more detail *infra* in connection with the predominance requirement.

11

Ms. Franco's claim is typical of claims of the class members, and neither party has identified differences between her claim and those of other class members that make her claim atypical.

### 4. Adequacy of Representation

Rule 23(a) requires that the class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent," as well as to assess the "competency and conflicts of class counsel." *Amchem*, 521 U.S. at 625, 626 n.20; *accord Carolina Youth*, 60 F.4th at 780; *see also Wal-Mart*, 564 U.S. at 349 n.5. There are two components to the adequacy requirement: "(1) the interests of the proposed class representatives and class members must coincide; and (2) the plaintiffs' attorneys must be qualified, experienced, and able to conduct the litigation." *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 308 (D. Md. 2022).

Ms. Franco has so far been an active participant in the case. She has participated in a deposition, communicated with counsel, and been involved with the discovery process. Doc. 45-15 at p. 4 ¶ 9. Progressive does not dispute that Ms. Franco is an adequate representative of the class.

Nor does Progressive dispute that her attorneys are qualified, experienced, and able to conduct the litigation. The Court has independently reviewed the qualifications, experience, knowledge of the law, and resources of the proposed class counsel, Hemmings & Stevens PLLC. Hemmings & Stevens, PLLC is a Raleigh-based firm with practice areas that include consumer finance, insurance claim litigation, and class action

12

litigation.  *Id.* at 6.  Mr. Hemmings and Ms. Stevens are experienced attorneys who have practiced law for many years.  *Id.* at p. 2 ¶¶ 1–2.  Mr. Hemmings has been appointed class counsel in other federal cases.  *Id.* at p. 3 ¶ 4; *Giercyk v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 13-CV-6272, Doc. 268 at ¶ 6 (D.N.J. Oct. 13, 2016); *Begley v. Ocwen Loan Servicing, LLC*, No. 16-CV-149, Doc. 61 at ¶ 2 (N.D. Fla. Nov. 22, 2017).  They also have extensive experience in complex cases in North Carolina business court.  *See* Doc. 45-15 at 7–8.

Ms. Franco and Plaintiff's Counsel are competent and able to fairly and adequately represent the interests of the class.  *See* Fed. R. Civ. P. 23(a)(4).  The adequacy requirement is satisfied.

## C.  Rule 23(b) Requirements of Predominance and Superiority

A plaintiff pursuing a class action must establish that the case fits into at least one of the three subsections of Rule 23(b).  *Comcast*, 569 U.S. at 33.  Here, Ms. Franco relies on Rule 23(b)(3), Doc. 45 at 14, which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3); *accord Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem*, 521 U.S. at 623.  "[C]ommon issues of liability may still predominate even when some individualized inquiry is required."  *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 305 (4th Cir. 2013); *see also Krakauer*

13

*v. Dish Network L.L.C.*, 311 F.R.D. 384, 399 (M.D.N.C. 2015) ("Predominance . . . does not require all issues to be common." (cleaned up)); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 429 (4th Cir. 2003). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one . . . [that] is susceptible to generalized, class-wide proof." *Tyson Foods*, 577 U.S. at 453 (cleaned up). "The predominance requirement focuses on the quality of common issues rather than just the quantity." *Krakauer*, 311 F.R.D. at 394; *see also Gunnells*, 348 F.3d at 429; *EQT Prod.*, 764 F.3d at 366.

The superiority requirement looks at whether the class action "would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated." *Amchem*, 521 U.S. at 615 (cleaned up). Superiority reflects the policy at the core of class actions, which were designed to overcome the problem that "small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 513 (2017). Class actions address "this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Amchem*, 521 U.S. at 617 (cleaned up).

Rule 23(b)(3) provides a non-exclusive list of factors for courts to consider in deciding whether a class action meets these two requirements:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of

14

concentrating the litigation of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3); *see also Thorn*, 445 F.3d at 319.

### 1. Predominance

Courts look to the elements of the cause of action to decide if common questions of law or fact predominate. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). The elements of a Chapter 75 claim are: "(1) [the] defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Nobel v. Foxmoor Grp., LLC*, 380 N.C. 116, 120, 868 S.E.2d 30, 33 (2022); *accord Custer v. Dovenmuehle Mortg., Inc.*, No. 24-CV-306, 2024 WL 4528187, at *4 (M.D.N.C. Oct. 18, 2024).

Here, there are two overarching common questions of law: whether a violation of the total-loss regulation is a *per se* unfair trade practice under Chapter 75 and, if so, whether Progressive's application of the PSA violates the regulations. Even if a violation of the regulations is not a *per se* violation, there will be a common question of law at summary judgment as to whether the evidence is sufficient to show an unfair trade practice. If the case goes to trial, whether the facts found by the jury constitute an unfair trade practice will be a common question of law. *See Fortson v. Garrison Prop. & Cas. Ins. Co.*, No. 19-CV-294, 2022 WL 198782, at *2 (M.D.N.C. Jan. 13, 2022).

There are also many potential common questions of fact. These include, for example, whether Progressive purchased the rights to the Mitchell software, whether Progressive knew the Mitchell software applied the PSA, whether use of the PSA is in

15

line with standard industry practice, whether Progressive maintains documentation about the application of the PSA, whether information about how the PSA is calculated is available to insureds, and whether Progressive's conduct was a business activity. *See* Doc. 72-1.

Ms. Franco says that each putative class member was injured by the application of the PSA. She seeks compensatory damages for each putative class member in the amount of the PSA deduction to their vehicle's pre-accident cash value. Doc. 45 at 20–21. To determine that amount, she proposes a process with relatively simple math that is applied consistently for each putative class member: averaging the PSAs applied to each class member's WCTL Report. *Id.* at 20 n.10; *see* Doc. 45-13 at ¶ 16; Doc. 53 at 83–85.

Whether the averaged PSA amount is a proper measure of damages is a common question of law. And if the Court concludes that it could support a damages award, it then becomes a common question of fact.

If the plaintiff proves this damages method by a preponderance of the evidence and the jury accepts this as an appropriate measure of damages, the method will require an individualized mathematical calculation, as each class member's reports will need to be examined and the math done at some point. But those questions are not complicated, and the method will not vary from class member to class member. In any event, the need for some individualized proof of damages does not alone defeat class certification, particularly when, as here, the damages calculation uses the same formula for each class member and is not particularly complex. *See Gunnells*, 348 F.3d at 429; *Ward*, 595 F.3d

at 180 (affirming class certification despite some individual damages inquiries when "the formula for damages was identical for all class members").

Progressive makes a series of similar arguments about the individual nature of the injury and damages questions. For example, Progressive contends that some class members received more money using the valuation method with PSA deductions than if Progressive had used a totally different valuation method like the NADA Guide; Progressive contends when that is the case, it has not violated Chapter 75 or the total-loss regulation, and the class member was not injured. Doc. 59 at 15–16, 22. According to Progressive, "the factfinder would need to consider the same individual evidence for every class member." *Id.* at 7.

But this ignores Ms. Franco's chosen method of calculating damages. Whether Progressive could have calculated the pre-accident value of each putative class member's vehicle "less favorably had it chosen another method is not relevant to the claim [the plaintiff] has chosen to pursue on behalf of the class." *Knight v. Progressive Nw. Ins. Co.*, No. 22-CV-203, 2024 WL 5046481, at *5 (E.D. Ark. Dec. 9, 2024); *see also Reynolds v. Progressive Direct Ins. Co.*, 346 F.R.D. 120, 132 (N.D. Ala. 2024) ("That other methodologies might have meant *even lower* payouts to class members does not mean Progressive's adopted methodology benefitted them."). Here, Ms. Franco asserts that the uniform application of an arbitrary PSA to reduce the money Progressive pays for the total loss of a vehicle is an unfair practice, *see* Doc. 45 at 9, 11–13, 18; Doc. 20 at ¶¶ 34–37, 96; *see also* Doc. 45-13 at ¶ 15, and that the pre-accident value can be reliably determined for every class member by removing the PSA from each valuation. *See* Doc.

17

62 at 11–12; Doc. 45-13 at ¶ 16; Doc. 72-1 at 4. The jury may or may not accept that assertion, but it is a common method of proof. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) ("Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."). And "Progressive can hardly complain that the methodology [Ms. Franco] would impose on them is the one Progressive chose and developed." *Volino v. Progressive Cas. Ins. Co.*, No. 21-CV-6243, 2023 WL 2532836, at *9 (S.D.N.Y. Mar. 16, 2023).

As the defendants point out, Doc. 59 at 6–7, 15–18, there are cases that support their argument. *See Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134 (9th Cir. 2022); *Henson v. Progressive Premier Ins. Co. of Ill.*, No. 22-CV-182, 2024 WL 3051264 (E.D.N.C. June 10, 2024). But those cases are not as persuasive, given how Ms. Franco proposes to prove injury and damages.

Progressive's standing argument is unpersuasive for the same reason. All class members have been injured under Ms. Franco's theory of the case because they were subject to an allegedly unfair practice that resulted in each putative class member receiving less money than they otherwise would have and should have received for their total-loss claim. *See* Doc. 45-13 at ¶¶ 10, 15; Doc. 53 at 65–66, 83.

Progressive also makes a convoluted argument about individual settlement negotiations, Doc. 59 at 20–21, but it has again overlooked Ms. Franco's theory of damages. It has also overlooked the fact that the insurance regulations require it to make a reasoned determination of the pre-accident actual cash value at the beginning of the

18

process. *See* Doc. 25 at 5–6; 11 N.C. Admin. Code 4.0418(c). North Carolina regulations do not allow deliberate low-balling.

According to Progressive, Ms. Franco asserts "that she and the putative class members are entitled to a return of the PSA simply because it was allegedly insufficiently documented," and Ms. Franco cannot show an injury from this conduct with common evidence. Doc. 59 at 24. But that is not accurate. Ms. Franco takes the position that Progressive never collects or retains information in its files supporting the calculation of the PSA, which she says is a violation of the regulation. Doc. 62 at 9. And Progressive has not said that sometimes it maintained the documentation and other times it didn't. Thus, the plaintiff has proposed common evidence on this point. Progressive's argument is again unpersuasive because it misapprehends both Ms. Franco's theory of the case and her method of proof.

Progressive also contends that Ms. Franco has not presented common evidence to show whether the defendants applied the PSA to each putative class member's total-loss claim. Doc. 59 at 19. But only insureds who had the PSA applied to their valuation are members of the class. *See* Doc. 44 at 1; Doc. 45 at 6. The fact that there are individual inquiries involved in ascertaining class membership, which can be determined fairly easily from Progressive's own business records, does not affect the predominance evaluation.

Lastly, Progressive contends that Ms. Franco has abandoned her unfairness claim because she does not show common evidence that the application of the PSA is unfair. Doc. 59 at 25–27. But Ms. Franco does point to common evidence that the conduct is

19

unfair, including expert opinions on industry standards and evidence that it violates public policy. *See, e.g.*, Doc. 45-13 at ¶ 15. Whether the evidence is sufficient is more appropriately resolved at summary judgment or trial.

Common questions predominate.

### 2. Superiority

A class action is the superior method of litigation of Ms. Franco's Chapter 75 claim. The available damages for each individual putative class member will be relatively small; each will only be entitled to a few hundred dollars. *See* Doc. 47-14 at 6; Doc. 49 at 6. The type of injury the putative class members allegedly suffered is not a personal injury or death of a loved one, where a plaintiff will ordinarily have "a substantial stake in making individual decisions on whether and when to settle." *Amchem*, 521 U.S. at 616. Here, "the class members likely have little interest in controlling the litigation." *See Krakauer*, 311 F.R.D. at 400.

Given the large number of class members, class-wide adjudication will be more efficient. *See Gunnells*, 348 F.3d at 432–33; *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004). Adjudicating these claims in one forum will provide flexibility, control, and consistency that would not exist with individual litigation. *See* Fed. R. Civ. P. 23(b)(3)(C); *Gunnells*, 348 F.3d at 425, 433. And, as discussed *supra*, the potential individual issues do not present great difficulties in managing the class. *See* Fed. R. Civ. P. 23(b)(3)(D).

Progressive contends that a class action is not superior "[b]ecause a trial here would devolve into thousands of mini-trials." Doc. 59 at 27. But as explained *supra*,

20

common issues predominate, and it is highly likely that the case can be resolved without significant individual fact-finding.

Progressive also contends that policyholders have used and may continue to use "informal negotiation and dispute resolution" to resolve actual cash value concerns. *Id.* at 27–28. But resolving these claims through a class action will be more efficient and promote quicker resolution of more claims. And if Ms. Franco is correct about the use of the PSA, the class action will do away with the need for these negotiations, which she says are unnecessary and unfair and take an unlawful valuation as their starting point and put the burden on thousands of individual insured consumers to call out Progressive's unlawful conduct.

The superiority requirement is satisfied.

## V. Appointment of Class Representative and Class Counsel

Ms. Franco moves to be appointed as class representative, and she moves to appoint her attorneys as class counsel. Doc. 44 at 2. As stated *supra*, Ms. Franco is an adequate representative of the class, and her counsel, Hemmings & Stevens, PLLC, are experienced and capable of overseeing the representation of the class. Progressive makes no argument to the contrary.

## VI. Conclusion

Ms. Franco's motion for class certification will be granted. She is a member of the proposed class, and she has demonstrated that the members of the proposed class are ascertainable. The class is sufficiently numerous, Ms. Franco's claims are typical of class members, she and her counsel are adequate representatives, common questions of law

and fact predominate, and a class action is the superior method of adjudication. The defendants' arguments against predominance and superiority are unpersuasive and do not defeat the predominance of the common, central issues in this case. Ms. Franco will be appointed as class representative, and her counsel, Hemmings & Stevens, PLLC, will be appointed as class counsel.

It is **ORDERED** that:

1. The plaintiff's motion for class certification, Doc. 44, is **GRANTED**.

2. The following class is **CERTIFIED**:

> All Progressive insureds of any North Carolina Progressive Company underwriting policies in North Carolina with first-party auto policies issued in the State of North Carolina, who received compensation for the total loss of their vehicles under their first party (comprehensive, collision, and UM/UIM) coverages, and who received a total loss valuation from Progressive generated by the WCTL program which took a deduction/adjustment for "projected sold adjustment" and were paid the amount of the valuation with the "projected sold adjustment."

3. The plaintiff, Mayra Franco, is **APPOINTED** as class representative.

4. Hemmings & Stevens, PLLC are **APPOINTED** as class counsel.

5. The plaintiff **SHALL** present a draft proposal about class notice to the defendant within five business days. The proposal shall include a proposed notice to class members, a method for its distribution, a schedule for opting out, and any and all other matters requiring resolution related to notice. The parties **SHALL** promptly meet and confer, exchange revised drafts, and confer at least one more time. No

22

later than June 2, 2025, the parties **SHALL** file a Joint Submission on Class Notice and Trial containing their joint proposal or, if they do not agree in full, dueling proposals with short briefs directed to items of disagreement.

6. The Joint Submission **SHALL** also address an appropriate trial date, taking into account both the need to provide meaningful class notice and time to opt-out and the need to move the case promptly and efficiently toward final resolution.

This the 14th day of May, 2025.

_____
UNITED STATES DISTRICT JUDGE